ADAMS, District Judge.
These actions arose out of a collision in the East River, between the ferryboat “Vermont,” belonging to the Brooklyn Ferry Company of New York, and the steamtug “N. & W. 2,” belonging to the Baltimore and Boston Barge Company, on the 27th day of January, 1902, about 1115 o’clock P. M. The Vermont is a side wheel ferryboat about 160 feet long, running on a ferry between Broadway, Brooklyn, and the foot of Grand Street, Manhattan, and was making a trip from Brooklyn to Manhattan. The tug is a• steel ocean going tug about 135 feet long, and was proceeding light, down the river, bound for Hoboken. The tide was strong ebb. The weather was clear and the wind light from the west.
Coming down the river ahead of the No. 2 and somewhat nearer Manhattan, were the tug Transfer No. 7, with a car float on each side, and the tug Dalzell, light. The No. 7 was in about the middle of the river. The Dalzell was between her and the Brooklyn shore not more than 75 feet away. Two other tugs with tows, bound down the river, the M. J. Moran and the Theodore Smith, were somewhat further up the river, the Moran being nearer the Brooklyn shore than the Dalzell and the Smith nearer the Manhattan shore than the No. 7. There was not very much difference in the speed of all these boats, which was probably at the rate of 8 or 9 miles per hour over the ground.
As the Vermont left her slip, she put her helm hard-a-port. • This was necessary to overcome the effect of the ebb tide. She started at the full speed of her engine but could not immediately get under full headway. When she came out of her slip, the leading tugs were *172 about opposite Houston Street on the Manhattan side, and Grand Street on the Brooklyn side. The Manhattan destination of the Vermont was about opposite her starting place on the Brooklyn side. There was ample room for the Vermont to cross ahead of the leading tugs with her helm hard-a-port, without interfering with their navigation, and she blew a signal of two blasts of her steam whistle to indicate that she intended to take that course. No. 7 answered with a signal of two. There is some conflict as to whether the Dalzell answered this signal or not. According to the testimony of No. 2 she did not hear the signal. The Smith and the Moran both heard it, but were not affected in any way by the Vermont’s proposed navigation and did not respond. The Vermont, after waiting an interval for a response from No. 2, during which she proceeded about a length from the outer end of the slip, slowed her engine and blew another signal of two blasts. The Dalzell did respond to this signal with a signal of two blasts. According to the testimony of No. 2 she did not hear the Vermont’s signal. Not hearing from No. 2, the Vermont stopped her engine. In the meantime her helm had been kept hard-a-port, with the effect of causing her to head somewhat up the river and meeting in that way the strong tide, her headway was quickly overcome, and she came to a stand-still in about the centre of the river.
No. 2 claims that she blew two signals of one blast each to the Vermont. These signals were not heard on the Vermont. Most of the witnesses did not hear them. The Dalzell heard two sharp single blasts of a whistle, a few seconds apart, from a vessel behind her, presumably No. 2, but it was understood on the Dalzell, that if the signals were from No. 2, they were given to her as overtaking signals, which would have been proper under the circumstances.
There is a dispute as to the speed No. 2 was making over the ground, the Vermont claiming that it exceeded the rate of 12 miles per hour and the No. 2 claiming that it was under 10 miles. It was conceded by the No. 2 that she was proceeding under full speed bells and that her ordinary full speed at sea is n}4 knots, but she contends that, owing to reduced boiler pressure and not running with her steam valves wide open, she was not going over miles. I am inclined to believe that her estimate of speed is too low. She has failed to adequately explain how her ordinary full speed of knots in still water, aided by the current in the river, estimated to amount to about 4 miles per hour, was reduced so materially. It is reasonably clear that her speed was considerably in excess of the admitted rate.
Whether the Vermont had room to pass safely ahead of No. 2, in view of the latter’s excessive speed, is uncertain. But, in any event, she did not attempt it in the absence of an assenting signal, and while .she did not reverse, she stopped her headway, with the aid of the tide, before reaching No. 2’s course, which was somewhat towards Manhattan. When No. 2 came up to No. 7 and the Dalzell, she chose- a course between them, though it made a very close shave, admittedly not more than 20 feet away from either, and went so close to the Dalzell that the latter had to change her course to avoid danger of collision. A continuance of this course would have car *173 ried No. 2 clear of the Vermont with a margin of from ioo to 200 feet; but just after passing the No. 7 and the Dalzell, and when within a short distance of the Vermont, she suddenly changed her course several points to port and quickly broúght about the collision, No. 2 striking, with her starboard bow, the Vermont, on her starboard bow, with the effect of seriously damaging the Vermont and causing some injury to herself. No. 2, while admitting the change of course, denies that it was made by a change of her helm but alleges that she was in danger of collision, through a forward movement on the part of the Vermont, to avoid which, she reversed her engine full speed and that the effect of the reversing, while finally arresting her headway before the collision so that she was only moving ahead with the current, was to throw her stern to starboard and her bow to port. No. 2 had a right handed propeller, and it is generally observed that the effect of such a screw in reversing, i. e., turning to the left, is to throw the vessel’s stern the way the screw is going, if it has any effect while the vessel is moving forward. In this case, the natural result from reversing would have been to throw the stern in exactly the opposite direction from that which No. 2 claims. No explanation is offered of the claimed unusual effect. It is simply stated that this vessel and another similar vessel were so affected by the action of their screws. In the absence of some explanation, T conclude that the change of course to port was the result of star-boarding the helm, especially as many witnesses testify that No. 2’s speed forward continued with little abatement to the time of collision. As I have already found that the Vermont was not going ahead at the time, it follows that the severe crash of the collision and the damage from it, were due to a forward movement of No. 2. The departure from her course was without justification, in view of the fact that the Vermont offered no obstacle to its being kept. It is probable that those on No. 2 supposed the Vermont was proceeding ahead and that a collision might occur if No. 2 kept on, but this supposition was erroneous and no doubt due to the failure to make accurate observations, through attention being altogether given to No. 2’s hazardous navigation in proceeding between the Dalzell and No. 7.
The place of collision was about the middle of the river, a little below the Manhattan slip of the Vermont.
Upon the foregoing facts, I must find the No. 2 in fault for not maintaining her course. No doubt her navigation was unskillful and reckless in other respects, but this fault stands forth prominently and is sufficient to condemn her.
It is insisted by No. 2 that the Vermont was in fault in several particulars, viz:
1. In not having a lookout forward and properly attending to his duties.
2. In not keeping out of the No. 2’s way pursuant to Article 19, and for failing to avoid crossing ahead of the tug, as required by Article 22.
3. In not stopping sooner and in that she did not reverse her engines before the collision as required by Article 23.
The Vermont’s lookout was stationed under the hood of the cabin *174 instead of on the bow and the testimony indicates that he was not attending to his duties. If it were not clear that the neglect of the Vermont in this particular did not contribute in any way to the collision, I should hold'her in fault, but when it appears that everything the lookout could'have seen or advised the pilot of was seen and known by him and that the Vermont performed her duties as well without the lookout’s aid as she could do with it, I must disregard the neglect. It is too uncertain about the signals of No. 2 having been given to the Vermont to attach much importance to them. Moreover, if they were given and had been heard, it would not have changed the situation. The navigation of the Vermont when she did not receive an assent to go ahead was in conformity with an insistence by No. 2, of her right to pass ahead, which the Vermont yielded to.
I have found above that the Vermont did not in any way interfere with the course of No. 2 and that if the latter had maintained it, there would have been no collision. The signals of the Vermont could have been of no embarrassment to No. 2 because she did not hear them.
The Vermont stopped in time to avoid the course of No. 2 and she could not be expected to back away from an apparently safe position, in the expectation that No. 2 would improperly change her course. Moreover, a reversal would not have avoided the collision in view of the speed of No. 2.
It has been stated in support of the contention that the Vermont did not overcome her headway before the collision, that the No. 2 was swung around to port and up the river from the effect of the blow, but such result did not necessarily follow from a forward movement on the part of the ferryboat. The tug was already swinging to port before the collision and contact between her starboard bow and a stationary object would have a tendency to throw her head up the river, especially as her stern would be swung rapidly down the river by the strong tide.
It follows that No. 2 must be held solely in fault for the collision. Decree for the Ferry Company, with an order of reference. The libel of the Barge Company is dismissed.